Susan Cooke
David D'Addio
Attorneys for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
**Boston Regional Office**
33 Arch Street, 24th Floor
Boston, MA 02110
(617) 573-4538
cookes@sec.gov
daddiod@sec.gov

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | **COMPLAINT** |
| -against- | Case No. |
| HANS K. HERNANDEZ, | JURY TRIAL DEMANDED |
| Defendant. | |

Plaintiff Securities and Exchange Commission ("Commission" or "SEC"), 33 Arch Street, 24th Floor, Boston, MA 02110, for its Complaint against Defendant Hans K. Hernandez ("Hernandez"), of Hillsborough, NJ, alleges as follows:

## SUMMARY

1. Hernandez, a former investment adviser, engaged in a fraudulent trade allocation scheme—commonly referred to as "cherry picking"—that benefitted him to the detriment of his investment advisory clients.

2. Hernandez's scheme generally entailed purchasing stock in his personal trading account and then deciding whether to allocate shares to his clients, or keep them in his personal

account, *after* observing which direction the stock price had moved during the trading day. If a stock increased in price, Hernandez frequently sold the shares and kept the trades in his own account, locking in a short-term profit for himself and depriving his clients of these gains. If the stock decreased in price, Hernandez often allocated some or all of the shares to client accounts, mitigating his own losses.

3. Between approximately July 2020 and February 2022, Hernandez generated more than $1 million in ill-gotten gains through his clandestine cherry-picking scheme. By secretly elevating his own economic interests above those of his advisory clients, Hernandez breached the fiduciary duty he owed his clients.

## JURISDICTION AND VENUE

4. The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) and 20(d) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §77t(b)], Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)], and Section 209(d) and 209(e) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-9(d), (e)].

5. The Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. §77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa] and Section 214 of the Advisers Act [15 U.S.C. § 80b-14].

6. Hernandez, directly and indirectly, has made use of the means or instrumentalities of interstate commerce or of the mails in connection with the acts, practices, transactions, and courses of business alleged herein.

7. Venue lies in this district because at all relevant times Hernandez lived in and transacted business in the District of New Jersey, and certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District, including the securities trades and related trade allocations Hernandez directed the broker to execute in the course of his fraudulent scheme.

**DEFENDANT**

8. **Hernandez**, age 55, was an investment adviser representative associated with then-SEC registered First Allied Advisory Services, Inc. ("First Allied") from July 2012 to November 2020 and SEC registered Cetera Investment Advisers LLC ("Cetera") from November 2020 to May 2023, when he was terminated. As an investment adviser representative, Hernandez was compensated for providing clients with investment advice, including making trading decisions on when to buy and sell stock on behalf of his clients. Between 2011 and 2022, Hernandez was also a registered representative associated with then-SEC registered Broker A.

**FACTS**

**I.    Hernandez Owed a Fiduciary Duty to his Clients.**

9. Between approximately July 2020 and February 2022, Hernandez worked as an investment adviser representative for First Allied and then Cetera and served as an investment adviser to his clients.

10. Investment advisers and investment adviser representatives, like Hernandez, owe their clients a fiduciary duty. That duty includes the obligation to act in their clients' best interests, to exercise the utmost good faith in dealing with their clients, to disclose all material facts, and to employ reasonable care to avoid misleading their clients.

11. Both First Allied and Cetera had policies that prohibited investment adviser representatives from disadvantaging their clients when trading securities for their own accounts. First Allied and Cetera informed advisory clients of these policies in their firm brochures, which stated that investment adviser representatives were "not permitted to disadvantage clients while trading in their own accounts."

## II. Hernandez Engaged in a Scheme to "Cherry Pick" Profitable Trades for Himself and Foist Unprofitable Trades on His Clients.

12. Contrary to First Allied's and Cetera's policies, and in breach of his fiduciary duty, from at least July 2020 to February 2022, Hernandez engaged in a pattern and practice of surreptitiously keeping "winning" trades for himself, while saddling his clients with "losing" trades that he allocated to their accounts.

13. Most commonly, Hernandez perpetuated his scheme by purchasing stock in his personal trading account and then deciding whether to keep or allocate the shares *after* observing if the stock price had increased or decreased during the trading day.[1] If a stock increased in price, Hernandez would often sell the stock the same day and keep the trade in his personal account, locking in a short-term profit for himself and depriving his clients of these gains. If the stock decreased in price, Hernandez often would not sell, but instead instruct Broker A's trade desk to allocate some or all of the shares to his clients' accounts, thereby disproportionately shifting these unrealized losses due to price movements to his clients.[2]

---

[1] In other less frequent instances, Hernandez first purchased stock either exclusively or additionally in an account in the name of one or more of his largest clients, and later allocated the shares either to his own account or client accounts after observing the stock price movements during the day.

[2] A realized first-day profit or loss means an actual profit or loss from a completed round-trip transaction during the same trading day (*e.g.*, the purchase of 100 shares of XYZ Inc. stock at $5.00 per share followed by the sale of those 100 shares later the same trading day at $6.00 per share would yield a realized first-day profit of $100). An

4

14. This pattern and practice of Hernandez capturing first-day gains for himself while allocating much of the first-day losses to his clients was repeated thousands of times between July 2020 and February 2022.

15. Hernandez's trading in Affirm Holdings Inc. (AFRM) on October 26, 2021 illustrates his cherry-picking scheme. At 9:35 a.m. that day, Hernandez bought 500 shares at a price of $157.71 per share in his personal account. A minute later, he bought 500 more shares of AFRM at $156.80 per share, also in his personal account. By 10:17 a.m., the price of AFRM stock had increased to $158.21 per share, at which point Hernandez sold the 1000 shares purchased earlier, realizing a net profit of $2,450 (based on an average buy price for all the AFRM shares purchased that day). At 12:05 p.m. and 12:26 p.m., respectively, Hernandez bought 1000 shares of AFRM at $155.58 per share and 1000 shares at $154.46 per share in his personal account. At 1:03 p.m., when AFRM's stock price had dropped to $150.48 per share, Hernandez emailed the trade desk with instructions on how to allocate the AFRM trades made earlier that day: the profitable trade (the purchase and sale of 1000 shares that had generated a net profit of $2,450) was to be allocated entirely to his own account and the unprofitable trades (the purchase of 1000 shares at $155.58 per share and 1000 shares at $154.46 per share) were to be allocated to three of his clients' accounts. Ultimately, the price of AFRM stock closed at $151.86 per share, causing unrealized first-day losses to clients of $7,808 (based on the closing price of AFRM stock that day). Hernandez, on the other hand, netted a realized gain of $2,450.

---

unrealized first-day profit or loss means the estimated profit or loss on a given securities position calculated at the close of market trading on the day it was established (*e.g.*, the purchase of 100 shares of XYZ Inc. stock at $5.00 per share and held through the close of market trading where stock's closing price was $4.00 would yield an unrealized first-day loss of $100).

16.   In another instance, on September 8, 2021, at 9:30 a.m., Hernandez purchased in his personal account 300 shares of The Goldman Sachs Group Inc. (GS) stock at a price of $409.22 per share. By 9:43 a.m., the price of GS stock had increased to $410.00 per share, at which point Hernandez sold the 300 shares, realizing a net profit of $769 (based on an average buy price for all the GS shares purchased that day). Between 10:30 a.m. and 10:42 a.m., Hernandez, again in his own account, purchased 900 shares of GS stock at an average price of $406.84. At 10:44 a.m. when GS stock was trading down at $405.75, Hernandez emailed the trade desk with his allocations: the purchase and sale of 300 shares of GS stock (and the resulting net profit of $769) were to be allocated exclusively to his personal account, while the purchase of 900 shares of GS stock that remained in the account and had declined in value was to be allocated to three client accounts. At 4:00 pm, the market for GS stock closed at $405 per share, causing an unrealized, first-day loss to Hernandez's three clients of $2,194 (based on the closing price of GS stock that day).

17.   Hernandez's selective, retroactive allocations ensured that his account received a disproportionately large percentage of the profitable first-day trades and that his clients' accounts were left holding a disproportionately large percentage of the unprofitable first-day trades. Specifically, between July 2020 and February 2022, approximately 80% of the trades Hernandez allocated to his own account increased in value over the first trading day, while only 47% of the trades Hernandez allocated to his clients' accounts increased in value during the first day. In other words, approximately 53% of the trades Hernandez allocated to his clients' accounts decreased in value over the first day, versus only 20% of the trades he allocated to himself. On average, Hernandez's account reaped a first-day return of approximately 0.50%, while his

clients' accounts suffered first-day <u>losses</u> of approximately 0.40%. A statistical test of the difference in first-day returns between Hernandez and his clients finds that the likelihood of this disparity happening by chance is nearly zero.

18. Over the course of the scheme, Hernandez generated for himself a first-day profit of more than $1 million (mostly realized profits) and caused first-day losses to his clients of more than $1.7 million (both realized and unrealized losses). The below charts provide a graphical illustration of the first-day profits in Hernandez's personal account versus that of his clients on a monthly basis:



### III.   Hernandez Acted with Scienter

19. In a recorded interview as part of the Commission's investigation into this matter, Hernandez admitted that when he made stock purchases in his personal account at the beginning of the trading day, he had not yet decided whether to have the trades allocated to himself or his clients.

7

20. Hernandez knew or was reckless in not knowing, and should have known, that he was engaging in numerous deceptive acts by disproportionately allocating first-day winning trades to his personal account and first-day losing trades to his clients' accounts.

## FIRST CLAIM

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Thereunder

21. The Commission repeats and incorporates by reference the allegations in paragraphs 1-20 above as if set forth fully herein.

22. By engaging in the conduct described above, Hernandez, directly or indirectly, acting knowingly or recklessly, by the use of means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities, has (i) employed devices, schemes or artifices to defraud and (ii) engaged in acts, practices or courses of business which operate as a fraud or deceit upon certain persons.

23. By reason of the foregoing, Hernandez has violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

## SECOND CLAIM

### Violation of Section 17(a)(1) and (3) of the Securities Act

24. The Commission repeats and incorporates by reference the allegations in paragraphs 1-20 above as if set forth fully herein.

25. By engaging in the conduct described above, Hernandez, directly and indirectly, acting knowingly, recklessly, or negligently, in the offer or sale of securities by the use of means or instrumentalities of interstate commerce or the mails, has (i) employed devices, schemes or artifices to defraud and (ii) engaged in transactions, practices or courses of business which

8

operate as a fraud or deceit upon purchasers of the securities.

26. By reason of the foregoing, Hernandez has violated Section 17(a) of the Securities Act [15 U.S.C. §77q(a)].

## THIRD CLAIM

### Violation of Sections 206(1) and (2) of the Advisers Act

27. The Commission repeats and incorporates by reference the allegations in paragraphs 1-20 above as if set forth fully herein.

28. At all relevant times, Hernandez was an "investment adviser" within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. §80b-2(a)(11)].

29. By engaging in the conduct described above, Hernandez, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly has: (i) knowingly or recklessly employed a device, scheme, or artifice to defraud a client or prospective client and (ii) knowingly, recklessly, or negligently engaged in a transaction, practice, or course of business which operates as a fraud or deceit upon a client or prospective client.

30. By reason of the foregoing, Hernandez has violated Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§80b-6(1), 80b-6(2)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission requests that this Court:

A. Enter a permanent injunction restraining Hernandez and each of his agents, servants, employees and attorneys and those persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, from directly or indirectly engaging in the conduct described above, or in conduct of similar purport and effect;

    B.    Require Hernandez to disgorge his ill-gotten gains, plus pre-judgment interest;

    C.    Require Hernandez to pay an appropriate civil monetary penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]; and

    D.    Award such other and further relief as the Court deems just and proper.

Dated: September 27, 2024
       Boston, Massachusetts

/s/ *Susan Cooke*
Susan R. Cooke
David D'Addio
Attorneys for Plaintiff
U.S. SECURITIES AND EXCHANGE COMMISSION
Boston Regional Office
33 Arch Street, 24th Floor
Boston, MA 02110
(617) 573-4538 (Cooke direct)
cookes@sec.gov (Cooke email)

## LOCAL RULE 11.2 CERTIFICATION

Pursuant to Local Rule 11.2, I certify that the matter in controversy alleged against the Defendant in the foregoing Complaint is not the subject of any other civil action pending in any court, or of any pending arbitration or administrative proceeding.

<u>/s/ *Susan Cooke*</u>
Susan R. Cooke
David D'Addio
Attorneys for Plaintiff
U.S. SECURITIES AND EXCHANGE COMMISSION
Boston Regional Office
33 Arch Street, 24th Floor
Boston, MA 02110
(617) 573-4538 (Cooke direct)
cookes@sec.gov (Cooke email)

## DESIGNATION OF AGENT FOR SERVICE

      Pursuant to Local Civil Rule 101.1(f), because the Securities and Exchange Commission does not have an office in this district, the undersigned hereby designates the United States Attorney's Office for the District of New Jersey to receive service of all notices or papers in this action at the following address:

United States Attorney's Office
District of New Jersey
Attention: Angela E. Juneau
Assistant U.S. Attorney
970 Broad Street, Suite 700
Newark, NJ 17102

                                                      /s/ *Susan Cooke*
                                                    Susan R. Cooke
                                                    David D'Addio
                                                    Attorneys for Plaintiff
                                                    U.S. SECURITIES AND EXCHANGE COMMISSION
                                                    Boston Regional Office
                                                    33 Arch Street, 24th Floor
                                                    Boston, MA 02110
                                                    (617) 573-4538 (Cooke direct)
                                                    cookes@sec.gov (Cooke email)