**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **-against-** | ) | |
| | ) | **Case No. 3:24-cv-09487-GC-RLS** |
| **HANS K. HERNANDEZ** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR DISGORGEMENT, PREJUDGMENT INTEREST, AND A CIVIL MONETARY PENALTY AGAINST DEFENDANT HANS K. HERNANDEZ**

## TABLE OF CONTENTS


**PRELIMINARY STATEMENT** .......... 1

**ARGUMENT** .......... 3

I. The Commission's Disgorgement Calculation is Consistent with Supreme Court Precedent .......... 3

II. The Disgorgement Period is the Period of the Scheme Alleged in the Complaint .......... 4

III. The Commission's Disgorgement Figure is Reliable and Appropriately Measures Hernandez's Ill-Gotten Gains .......... 5

A. The Commission's Methodology Properly Used Market Closing Prices .......... 6

B. First Day Returns Are the Proper Measure of Disgorgement in a Cherry-Picking Case .......... 8

C. Hernandez Had a Disproportionate Amount of Day Trades *Because* He Cherry Picked .......... 10

D. Specific Accounts .......... 10

E. Hernandez's Covered Call Options Trading Suggests More Cherry Picking and Would Increase His Ill-Gotten Gains and Prejudgment Interest .......... 11

IV. The Penalty Factors Weigh Heavily in Favor of a Substantial Penalty Against Hernandez Regardless of Present Inability to Pay .......... 11

**CONCLUSION** .......... 13

## TABLE OF AUTHORITIES

**Cases**

*CFTC v. Am. Metals Exch. Corp.*, 991 F.2d 71 (3d Cir. 1993) .................................................... 4

*Liu v. SEC*, 591 U.S. 71 (2020)........................................................................................... 3

*SEC v. Aletheia Rsch. & Mgmt., Inc.*, 12-cv-10692, 2015 WL 13404306
(C.D. Cal. May 11, 2015) .............................................................................................. 5

*SEC v. Bonan Huang*, 684 F. App'x 167 (3d Cir. 2017)……………………………………8

*SEC v. Brandonisio*, No. 2:11-CV-2011, 2013 WL 5371626 (D. Nev. Sept. 24, 2013)…………5

*SEC v. Fierro*, No. 20-02104 (GC) (JBD), 2024 WL 2292054 (D.N.J. May 21, 2024)……....7, 8

*SEC v. Levoff*, 2:19-cv-05536 (WJM), 2024 WL 3272262 (D.N.J. July 2, 2024)……………….12

*SEC v. McCaskey*, No. 98CIV6153, 2002 WL 850001 (S.D.N.Y. Mar. 26, 2002)……………….9

*SEC v. Secure Cap. Funding*, Civ. No. 11-916, 2014 WL 1716226 (D.N.J. Apr. 29, 2014)……12

*SEC v. Warren*, 534 F.3d 1368 (11th Cir. 2008)………………………………………...…12

*SEC v. Werthe*, 23-cv-0815, 2025 WL 790970 (S.D. Cal. Mar. 12, 2025)………..………7, 12

*SEC v. World Tree Fin., LLC*, 43 F.4th 448 (5th Cir. 2022)………………………….....5, 12

*Sripetch v. SEC*, 146 S.Ct. 1403 (2026)........................................................................... 3

*U.S. v. Carter*, 217 U.S. 286 (1910) ................................................................................ 3

Plaintiff, Securities and Exchange Commission ("Commission"), submits its reply brief in support of its motion for monetary remedies ("Motion") against defendant Hans K. Hernandez ("Hernandez"). For the reasons stated below, Hernandez's brief in opposition ("Opposition" or "Opp.") fails to justify the reductions he seeks to monetary remedies, and the Court should grant the Commission's Motion.

## PRELIMINARY STATEMENT

Hernandez's arguments against disgorgement ignore what this case is about. Hernandez also disregards the allegations of the Complaint, which he agreed as part of his settlement are accepted and deemed as true by the Court for purposes of the Commission's Motion. When properly framed as a cherry-picking case in which Hernandez breached his fiduciary duty to advisory clients when allocating trades, Hernandez's core arguments fall away.

This case concerns profits and losses on the days when Hernandez could make, and did make, decisions to allocate stock trades after he observed how they performed. Time and again, Hernandez made allocation decisions that benefited himself to the detriment of his clients. *See, e.g.,* Complaint ¶ 14 (describing pattern and practice of "Hernandez capturing *first-day gains* for himself while allocating much of the *first-day losses* to his clients") (emphasis added). Accordingly, the Commission seeks a disgorgement amount representing the immediate, first-day ill-gotten gains that Hernandez made from his scheme in breach of his fiduciary duty.

In Hernandez's mind, however, his clients were not really harmed if he dumped a losing trade into their account, so long as the price of the security increased in the long run. Market performance, however, is outside the subject of this case just as it was outside the control of Hernandez. Hernandez provides no authority for the proposition that the market's longer-term performance relieves an investment adviser's breach of fiduciary duty. Nor would a lack of

ultimate client pecuniary harm, even if true, absolve Hernandez of disgorgement of the ill-gotten gains causally connected to his illegal conduct.

Hernandez again disregards the fundamental nature of a cherry-picking scheme when he argues that not all of his client accounts were permitted to day trade. Hernandez argues correctly, but proves the Commission's point, that his own accounts were more heavily weighted toward day trades. Hernandez's own accounts had more day trades *because* he fraudulently chose to sell stocks that had increased in price during the trading day, making them a day trade, and disproportionately kept those profits for himself. If Hernandez acted consistent with his fiduciary duty, he would have avoided the temptation of cherry picking and adhered to a pre-trade allocation plan regardless of how trades performed. That could mean that certain client accounts, prohibited from day trading, would have to hold immediate but unrealized gains, rather than selling immediately. Instead, Hernandez disproportionately took those trades for himself and now argues that he should be permitted to keep the proceeds.

As to the penalty, Hernandez's argument hinges on a single factor, his purported inability to pay, that courts have discretion to consider when assessing a penalty amount. Hernandez says nothing regarding the other factors that weigh heavily in favor of a substantial penalty. Instead, Hernandez's statements in his Certification minimize his misconduct, disregard his fiduciary duty and how he breached it, show a lack of empathy for the clients he victimized, and offer baseless justifications for his scheme. That, coupled with the nature and extent of Hernandez's violations, underscores the need for the meaningful civil penalty sought by the Commission.

## ARGUMENT

### I. The Commission's Disgorgement Calculation is Consistent with Supreme Court Precedent.

In *Liu*, the Supreme Court held that "a disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under § 78u(d)(5) [Section 21(d)(5) of the Exchange Act]." *Liu v. SEC*, 591 U.S. 71, 75 (2020). In limiting disgorgement awards to "net profits" the Court held that traditional equitable principles called for "deducting legitimate expenses." *Id*. at 84-85. Those legitimate expenses in the context of investments may include the "marginal costs incurred in producing the revenues that are subject to disgorgement." *Id*. at 91 (citing Restatement (Third) § 51). No such expenses are at issue here and Hernandez cites none.

Further, the Commission's disgorgement calculation is consistent with the Supreme Court's recent ruling in *Sripetch.* The Court held that a showing of pecuniary harm to investor victims is not required for the Commission to seek, and a court to order, disgorgement. *Sripetch v. SEC*, 146 S.Ct. 1403, 1410 (2026). Instead, disgorgement measures "the value of the gain attributable to [the defendant's] invasion of . . . legally protected interests without requiring a showing of pecuniary loss." *Id.* at 1411. Here, Hernandez's invasion of his clients' legally protected interests include not only his clients' pecuniary harm, but also his breach of the fiduciary duty that he owed to them. *Id.* (citing *U.S. v. Carter*, 217 U.S. 286, 305-06 (1910)) (decision concerning breach of fiduciary duty).

The Commission seeks Hernandez's ill-gotten gains from first-day trades, which are the ill-gotten gains causally connected to his cherry picking scheme, as required by *Liu*. Hernandez, on the other hand, begins his brief entirely on the wrong foot, arguing that the Commission's disgorgement figure lacks a "comprehensive analysis of the actual performance and disposition

of the securities involved." Opp. at 1. This is not a case about overall gains and losses for Hernandez and his clients. This case, and the Commission's disgorgement figure, concern Hernandez's cherry-picking scheme in which he disproportionately took *first-day* (trading day) winning trades for himself and allocated losing trades to his clients.

The Commission's disgorgement figure is a calculation of Hernandez's ill-gotten gains from his scheme. Unlike the *American Metals Exchange* decision that Hernandez cites, his clients' losses are not used as a proxy for disgorgement. *See CFTC v. Am. Metals Exch. Corp.*, 991 F.2d 71, 78-79 (3d Cir. 1993). Instead, in a cherry-picking case, investor losses equate to the defendant's ill-gotten gains because the fraudulent scheme involves unequal sharing of first-day profits and losses among the adviser and clients. *See* Jackson Decl., Dkt. No. 51-2, ¶¶ 14-15.

Hernandez also argues that his avoided losses are "hypothetical" and therefore beyond "actual net profits" (Opp. at 4-5). To the contrary, the first-day losses Hernandez avoided are not hypothetical. They are instead his fair and proportional share of *actual overall* first-day losses across all accounts that Hernandez managed. Jackson Decl. ¶¶ 9-11. The losses happened, but Hernandez avoided his share of them by disproportionately dumping losses on his clients.

## II. The Disgorgement Period is the Period of the Scheme Alleged in the Complaint.

There is nothing arbitrary about the 20-month period of the Commission's disgorgement analysis. That is the period of Hernandez's fraudulent cherry-picking scheme alleged in the Complaint. *See* Complaint ¶¶ 3, 9. The Commission seeks disgorgement from Hernandez of the ill-gotten gains that he received from cherry-picking trades during that period. Remarkably, Hernandez argues that he "[p]resumably . . . did not 'cherry pick' trades for only twenty months of the seven years of trading for which the SEC has data." Opp. at 6. That startling admission would seem to suggest that Hernandez's potential liability, and attendant ill-gotten gains, are

larger, perhaps much larger, than what the Commission seeks. The Commission, however, alleged a cherry-picking scheme during the period July 2020 through February 2022. If Hernandez is saying that he cherry-picked beyond that, that does nothing to mitigate his ill-gotten gains during the period of the Complaint. If he is arguing that he may not have cherry-picked outside that window, that would not lessen his ill-gotten gains from the period when he did defraud his clients.

### III. The Commission's Disgorgement Figure is Reliable and Appropriately Measures Hernandez's Ill-Gotten Gains.

Hernandez does not dispute that the Commission has calculated disgorgement with a method approved by courts in other cherry-picking cases, and he makes no effort to distinguish *World Tree Financial* or *Aletheia Research.* In *World Tree Financial,* the court affirmed a district court award of cherry-picking disgorgement "calculated [as] the difference between what each group would have received in the hypothetical fair allocation and the actual performance of each group." *SEC v. World Tree Fin., LLC,* 43 F.4th 448, 466 (5th Cir. 2022). In *Aletheia Research,* the court awarded disgorgement for cherry-picking violations that included unrealized gains and losses from purchase prices compared to market prices, in addition to realized gains. *SEC v. Aletheia Rsch. & Mgmt., Inc.*, 12-cv-10692, 2015 WL 13404306, at *3 (C.D. Cal. May 11, 2015).

Hernandez instead cites a decision that did not involve cherry picking, where the Commission on a motion for default judgment sought a disgorgement award without citing any evidence. *SEC v. Brandonisio*, No. 2:11-cv-2011, 2013 WL 5371626, at *9 (D. Nev. Sept. 24, 2013). Here, in contrast, the Commission's disgorgement figure was calculated by an economist using the method the Commission uses in similar cases and based on trading data. Jackson Decl. ¶¶ 4-5.

### A. The Commission's Methodology Properly Used Market Closing Prices.

Hernandez argues that the Commission should have calculated disgorgement based on the time of his allocation emails. Hernandez, who concedes that he "reviewed and catalogued all allocation emails," offers no alternative calculation, not even on a representative or anecdotal basis. Rather, he seems to assume, without providing evidence or examples, that going through the manual process of reviewing emails for allocation times would yield a disgorgement figure more accurate or favorable to him than using readily available closing price data. To the contrary, given the daily price movements among and across stocks, it is equally likely that using the exact allocation times would yield a similar, or even a higher number, than the closing prices used for the Commissions' disgorgement figure. The actual price at allocation may be relevant or informative, but no more or less reliable than using readily available closing prices.

An example of a cherry-picked trade in paragraph 15 of the Complaint illustrates the point. As alleged, Hernandez emailed the trade desk on October 26, 2021 with instructions to allocate shares of Affirm Holdings Inc. (AFRM) to clients after observing that its price had declined to $150.48 per share. AFRM's closing price that day was $151.86 per share, thus higher than the price at the time of allocation. This example demonstrates that if the Commission had calculated disgorgement at the time of Hernandez's allocation rather than at market close, in some cases it would have resulted in a higher disgorgement figure for those trades. The Commission's methodology utilizing closing prices is a straightforward and reasonable approximation of the change in price.

Hernandez argues that the emails he reviewed show that he sent allocation instructions to the trade desk at various times throughout the trading day and before the market closed, which he claims contradicts the Commission's assumption that Hernandez waited until after he observed a

trade's performance before deciding how to allocate it. This argument amounts to Hernandez improperly denying, for purposes of this Motion, that he engaged in cherry-picking at all.[1] The argument is also illogical because, as highlighted by the AFRM example above, even if Hernandez sent allocation instructions before the market close, he still had an opportunity to observe market price movement before allocating. It is the nature of a cherry-picking case, and the Commission's allegations here, that the adviser had an opportunity to observe the positive or negative price movement of a stock during the trading day. *See* Complaint ¶ 2.

This argument also ignores that a large part of Hernandez's scheme involved first purchasing the stocks in his own account, meaning that he could simply keep winning trades for himself rather than reallocate. There would not be an email memorializing when Hernandez decided to keep trades for himself after he observed price movement. On other occasions, Hernandez allocated losing trades from his account to client accounts. Hernandez's case is therefore distinguishable from other cherry-picking cases where an investment adviser used a block account to first acquire stocks and then allocate them using an average execution price. *See, e.g., SEC v. Werthe*, 23cv0815, 2025 WL 790970, at *1 (S.D. Cal. Mar. 12, 2025).

Hernandez's inappropriate use of his own account, rather than a block trading account that might show the exact time of all allocated trades, necessarily obscured the timing of his allocation decisions. Hernandez created the uncertainty in determining the exact time of his allocation decisions, and that uncertainty weighs against him. *See SEC v. Fierro*, No. 20-02104

---

[1] Similarly, Hernandez argues about the Commission's "win rate" figure. That figure is alleged in the Complaint, ¶ 17, and is evidence that cherry-picking occurred. It shows a rate of return benefiting Hernandez over his clients that is so disproportionate that it could not have happened by chance. The win rate, and the fact that Hernandez cherry-picked, are not at issue in this Motion. It was entirely appropriate, however, for the Commission to use a dollar-weighted win rate, because it properly accounts for the size of the winning trades that Hernandez took for himself, rather than simply the number of trades.

(GC) (JBD), 2024 WL 2292054, at *5 (D.N.J. May 21, 2024) (defendant's burden to "demonstrate that the [SEC's] disgorgement figure is not a reasonable approximation, with any risk of uncertainty fall[ing] on the wrongdoer") (*quoting SEC v. Bonan Huang,* 684 F. App'x 167, 176 (3d Cir. 2017)).

Similarly, as alleged in the Complaint, ¶ 13 n.1, Hernandez at times purchased stock in an account of one or more of his largest clients, and later allocated the shares to his own account or client accounts after observing stock price movements during the day. Hernandez argues, incorrectly, that those trades directly executed in client accounts presented no opportunity for post-execution allocation. And, just as leaving winning trades in his own account was an allocation decision, if a silent one, so too were Hernandez's decisions to leave trades in the client accounts where they were directly executed.

### B. First Day Returns Are the Proper Measure of Disgorgement in a Cherry-Picking Case.

It is irrelevant that Hernandez's clients may have generated positive longer-term profits. First, Hernandez's disgorgement figure is the measure of his own ill-gotten gains. His clients' harm is the mirror image because a cherry-picking scheme involves the disproportionate allocation of winning and losing trades between the defendant adviser and clients. Second, even if Hernandez's clients profited over the longer term, they still suffered a disproportionate share of first-day losses.[2] Hernandez argues against the Commission basing its disgorgement figure for unrealized losses on "temporary valuation changes" or "short-term market movement" (Opp. at 10), but that is precisely the harm from his breach of fiduciary duty in this cherry-picking case.

---

[2] As an economic matter, client losses compounded over time on a relative basis, even if the value of client holdings increased in absolute dollars. Clients would have had more invested and thus more to gain absent the cherry-picking scheme. The Commission, however, is not seeking to hold Hernandez liable for his clients' long-term losses and is not seeking disgorgement of Hernandez's disproportionate long-term gains.

Hernandez cannot dispute, for purposes of this Motion, that his scheme provided him with mostly realized profits while causing his clients a mix of realized and unrealized losses. Complaint ¶ 18. The Commission's disgorgement figure properly allocates to Hernandez the share of unrealized losses that he avoided by placing those losses disproportionately with his clients.

Hernandez similarly makes a red herring argument that his Forms 1099-B show that he received a lower "aggregate net profit" (Opp. at 7) or that the Commission ignored his "complete realized economic performance" (*Id*. at 16). This case does not concern Hernandez's overall, longer-term, profits and losses. Hernandez's Forms 1099-B show multiple instances of Hernandez selling a security at a loss several days after purchasing it. Losses like those may have lessened Hernadez's overall profitability, but do not take away from the amount of ill-gotten first-day profits that he made from his cherry-picking scheme. The Commission's disgorgement methodology properly measures the ill-gotten gains to Hernandez on the days that he engaged in cherry-picking.

The *McCaskey* decision that Hernandez cites for his wash-sales argument is inapposite. In that decision, the court faulted the Commission's disgorgement figure, in a trading manipulation scheme, for including the defendant's profitable trades without deducting for corresponding losses during the manipulation period. *See SEC v. McCaskey*, No. 98CIV6153, 2002 WL 850001, at *7 (S.D.N.Y. Mar. 26, 2002). Here, in contrast, the Commission's disgorgement figure is Hernandez's share of gains and losses from the trading days at issue. Hernandez attempts to offset his disgorgement liability with his overall losses *after* those relevant trading days, which is inconsistent with *McCaskey* and inapt for a cherry-picking case.

### C. Hernandez Had a Disproportionate Amount of Day Trades *Because* He Cherry Picked.

As to client account types, Hernandez argues that his own "accounts were weighted more heavily toward day trades, whereas the client pool was weighted more heavily toward maintaining open positions." Opp. at 11. *See also id*. at 17 (conceding "Hernandez's trading was overwhelmingly concentrated in profitable day trades"). This concession acknowledges the fundamental nature of a cherry-picking scheme. If Hernandez acted consistently with his fiduciary duty, one would expect to see winning trades allocated fairly across accounts, even if that meant that certain client accounts that could not day trade had to hold unrealized gains rather than sell right away.

### D. Specific Accounts

Hernandez criticizes the Commission's inclusion of three of his largest clients in its disgorgement calculation, by arguing that those three clients were large realized winners. Opp. at 9. While those three accounts may have profited from day trades (the Commission does not allege that Hernandez never allocated winning trades to clients), Hernandez completely ignores their losses, which Hernandez disproportionately avoided, of $1.3 million from losing open trades for overall first-day losses of $399,872. *See* Supplemental Declaration of Stuart Jackson, filed herewith ("Supp. Jackson Decl.") ¶ 19. It was therefore entirely appropriate for the Commission to include those three client accounts in its analysis of Hernandez's ill-gotten gains.

Hernandez does not dispute that his niece's account should be included among the Hernandez Accounts, but argues that three accounts for his business Vaughn Capital Partners, LLC, should be attributable to him as well, rather than considered client accounts. The Commission does not possess information in the current record to determine whether those accounts were purely for Hernandez's benefit distinct from employees, if any, of Vaughn Capital

Partners. Crediting Hernandez's argument, therefore, the Commission calculates that moving the Vaughn Capital Partners account to the Hernandez Accounts, rather than Client Accounts, would reduce Hernandez's ill-gotten gains to **$1,313,573**, a reduction of $25,216. Supp. Jackson Decl. ¶¶ 2-9. Prejudgment interest on that revised total amount is **$415,861**. *Id.* at ¶¶ 10-14.

### E. Hernandez's Covered Call Options Trading Suggests More Cherry Picking and Would Increase His Ill-Gotten Gains and Prejudgment Interest.

Hernandez argues that the Commission failed to account for his purchase of covered call options, but he offers no calculations, expert opinion, or other evidence that his options trading would have any meaningful impact on the Commission's disgorgement calculation. Hernandez argues that his clients received premiums for selling covered call options, but leaves unaddressed how those options performed. Hernandez states only that the equity positions were "in many instances" hedged by covered call options.

Significantly, Hernandez's options trading was consistent with his cherry-picking because it disproportionately favored him relative to his clients. *See* Supp. Jackson Decl. ¶¶ 15-18. While the Complaint does not contain allegations regarding Hernandez cherry picking options trades, and those trades therefore are not part of the disgorgement sought here, it is worthy of note that including this likely cherry-picking in options trading would increase Hernandez's disgorgement and prejudgment interest figures. *Id.*

## IV. The Penalty Factors Weigh Heavily in Favor of a Substantial Penalty Against Hernandez Regardless of Present Inability to Pay.

Hernandez does not dispute the majority of factors that weigh in favor of a substantial penalty against him. While Hernandez's declared inability to pay a penalty is one factor that the Court may consider in its discretion, it does not significantly mitigate the specific and general deterrent purposes of a penalty. "A defendant's ability to pay is 'at most' one factor the Court

should consider when imposing a penalty; securities laws do not prohibit the imposition of a penalty in excess of a violator's ability to pay." *SEC v. Secure Cap. Funding*, Civ. No. 11-916, 2014 WL 1716226, at *3 (D.N.J. Apr. 29, 2014) (quoting *SEC v. Warren*, 534 F.3d 1368, 1370 (11th Cir. 2008)).

Hernandez's Certification of his financial status also merits some skepticism. Even under Hernandez's own analysis of his gains and losses, his account generated $594,131 in just the twenty months relevant to this action. Opp. at 15. Hernandez provides no explanation for the use of those substantial proceeds. Indeed, he attaches only his most recent bank and credit card statements, rather than a comprehensive set of statements to show his spending, financial obligations, or movement of money. He argues that he lacks liquid assets, but leaves his overall assets unclear. Hernandez also states that he is reliant on his wife's income, but does not state the amount of that income or whether it could contribute to paying a penalty. Hernandez also fails to provide tax returns that would allow the Commission and the Court to evaluate his sources of income and assets. Finally, he focuses exclusively on his present ability to pay, while ignoring his future earning potential.

Regardless, Hernandez does not challenge the other factors weighing in favor of a substantial penalty. He does not dispute that his misconduct was egregious and recurrent. *SEC v. Levoff*, 2:19-cv-05536 (WJM), 2024 WL 3272262, at *3 (D.N.J. July 2, 2024) (citing cases for penalty factors in Third Circuit). Hernandez does not dispute that his breach of fiduciary duty favors a substantial penalty. *Id.* Nor does Hernandez dispute the necessity of a substantial penalty for deterrence purposes because cherry picking is, by its nature, "difficult to detect." *Werthe*, 2025 WL 790970 at *8 (citing *World Tree Fin.,* 43 F.4th at 462). Hernandez does not dispute

that a third-tier penalty is appropriate under the Securities Act, Exchange Act, and Advisers Act. *See* SEC Memorandum, Dkt. No. 51-1, at 10.

Finally, Hernandez's declaration reflects a pervasive minimization of his misconduct, disregard for the nature of his fiduciary duty and how he breached it, a lack of empathy for the clients he victimized, and a host of ill-founded justifications for his self-dealing fraud scheme. Rather than expressing any acceptance of responsibility or remorse, Hernandez relitigates factual points already conceded through his settlement and offers post-hoc rationalizations for his serious breach of fiduciary duty. Hernandez's absence of contrition, combined with his apparent inability to understand the wrongfulness of his conduct, reinforces the need for a serious and substantial civil penalty.

## CONCLUSION

For the reasons stated above, the Court should enter a Final Judgment imposing against Hernandez disgorgement, prejudgment interest, and a civil penalty in the amounts requested by the Commission.

Dated: September 14, 2026

Respectfully submitted,

SECURITIES AND EXCHANGE COMMISSION

By its attorneys,

*/s/ Michael C. Moran*

Michael C. Moran (Mass. Bar No. 666885)
Securities and Exchange Commission
33 Arch Street, 24th Floor
Boston, MA 02110
Phone: (617) 573-8931
Email: moranmi@sec.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of September 2026, a copy of the foregoing was filed electronically. Notice of this filing will be sent by email to all parties of record by operation of the Court's electronic filing system.

*/s/ Michael C. Moran*
Michael C. Moran